**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY**

| | |
|---|---|
| TERESA DARBY<br>14209 Floral Park Drive<br>N. Potomac, Md 20878<br><br>Plaintiff<br>v.<br><br>PNC MORTGAGE, NATIONAL ASSOCIATION<br>249 Fifth Avenue<br>Pittsburgh, PA 15222<br><br>Serve on Registered Agent:<br>CSC-Lawyers Incorporating Service Co.<br>7 St. Paul Street<br>Suite 820<br>Baltimore, Md 21202<br><br>Defendant | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**COMPLAINT PURSUANT TO THE CFPB, AND ELECTION OF JURY TRIAL**

Teresa Darby, Plaintiff, by her attorney, Gerard P. Uehlinger, Esquire, sues PNC Bank, National Association (PNC), and as grounds therefore says:

1. As a result of information obtained by Plaintiff in the course of the servicing of her loan for loss mitigation and as a result of Defendant's actions herein, Plaintiff now has grounds to make the following claim.

2. Mortgage servicers are companies responsible for the day-to-day management of a mortgage loan, including collecting payments from borrowers, holding funds in escrow accounts for insurance and tax purposes, remitting such escrow funds, interacting with borrowers, and administering the mortgage foreclosure process. Mortgage servicers are also responsible for overseeing and

implementing loss mitigation opportunities for borrowers to avoid loan delinquency and foreclosure.

3. After the 2007 and 2008 global financial crisis, the number of mortgage loan borrowers in the United States that became delinquent on their loans increased sharply. Mortgage servicers were unable to handle the rise in loss mitigation applications. A loss mitigation application is a request from a borrower to change the terms of a borrower's payment obligations to avoid delinquency or foreclosure. Loss mitigation plans take many forms, including those that would allow borrowers to retain ownership of their homes, such as loan modifications and forbearance agreements--but also ones that would allow borrowers to transfer ownership of their homes under more favorable terms than those allowed for by the loan agreement, such as short-sale agreements and deed-in-lieu of foreclosure programs. Mortgage servicers lacked adequate infrastructure to process loss mitigation applications from borrowers or to ensure that the foreclosure process was properly and effectively executed.

4. The industry-wide deficiencies of mortgage servicers laid bare by the financial crises led to a number of enforcement actions by federal and state regulators. The nation's largest servicers were forced to change many of their practices, including how they administered loss mitigation opportunities for borrowers. The Federal government also created programs designed to incentivize servicers to process more borrower loss mitigation applications according to certain guidelines.

5. Despite these actions, regulators were still concerned that mortgage servicers were not devoting sufficient resources to ensure both that borrowers were being adequately informed about potential loss mitigation opportunities and that borrower's applications were being processed. Thus, in January 2013, the United States Consumer Financial Protection Bureau (CFPB) ("the Bureau") issued a number of final rules amending the provisions of the Real Estate Settlement Procedures Act (RESPA) to require servicers to follow strict procedures for processing loss mitigation applications and to disclose certain information to borrowers about the status of their application. *See* 12 C.F.R. § 1024.41. The rules also afford consumers a private right of action against servicers that fail to comply. The effective date of these rules was delayed for a year to give the servicers time to bring their systems for processing loss mitigation applications into compliance with the new rules. The rules became effective on January 10, 2014.

6. The Bureau is an agency of the United States charged with regulating the offering and providing of consumer-financial products and services under "Federal consumer laws," 12 U.S.C. § 5491 (a), including the Fair Debt Collection Practices Act ("FDCPA") and the Consumer Financial Protection Act ("CFPA"). 12 U.S.C. § 5481(12)(H), (14). The Bureau's regulatory authority extends to persons engaged in the collection of debt related to any consumer-financial product or service. 12 U.S.C. § 5481(5), (15)(A)(x). The Bureau has independent litigating authority to commence civil actions by its own attorneys

to address the violations of "Federal consumer financial laws," including the FDCPA and the CFPA. 12 U.S.C. § 5564(a)-(b); 15 U.S.C. § 16921(b)(6).

7. The Consumer Financial Protection Bureau ("CFPB") changes affecting various sections of the Dodd Frank Wall Street Reform and Consumer Protection Act ("DFA"), Regulation Z of the Truth in Lending Act ("TILA") and Regulation X of the Real Estate Settlement Procedures Act ("RESPA") took effect on January 10, 2014. These changes affect lending from the origination of the loan through the closing, servicing and even the loss mitigation and foreclosure of the loan, if the loan is in default. The changes--new requirements--apply to "federally related mortgage loans" as defined in 12 U.S.C. § 1024.2(b), which can be generally described as home mortgages with certain exceptions. These requirements do not apply to home equity lines of credit, reverse mortgages, constructions loans that are not permanent financing, loans made by a lender who makes five or fewer mortgage loans in one year, and commercial loans. The new CFPB rules affect nearly all lenders, regardless of whether such lenders are servicing loans that they originated. In particular, the rules will impact and delay the foreclosure process against borrowers in default. Many of the new requirements are applicable to "servicers," which also includes lenders servicing loans that they originated.

8. PNC is one such servicer—one of the country's leading mortgage servicers. As described in detail below, PNC has failed to provide to Plaintiff the notices required by RESPA, failed to process Plaintiff's loss mitigation application

within the time frames set forth in the new rules, and has moved forward to violate the restriction on dual tracking by seeking to foreclose on the Plaintiff's home. Plaintiff submitted her loss mitigation application after the new RESPA regulations went into effect; PNC violated RESPA by failing to adhere to the requirements of 12 C.F.R. § 1024.41 with respect to the Plaintiff's loss mitigation applications. PNC's conduct with regard to its loss mitigation programs also violated the Maryland Consumer Protection Act, Md. Comm. Law, §§ 13-101 *et seq.*

## Regulatory Background

9. The mortgage market is the largest market for consumer financial products in the United States, with over $10 trillion in loans outstanding. Mortgage servicers play an important role in this market, taking on the day-to-day management of mortgage loans for lenders or for investors. Investors are entitled to the loan proceeds when a loan has been securitized.

10. Mortgage servicers are responsible for billing borrowers for amounts owed on the loan, collecting and distributing payments, maintaining and disbursing funds from escrow accounts, reporting to creditors and investors, and pursuing collection and loss mitigation activities—such as foreclosures and loan modifications for delinquent borrowers.

11. Mortgage servicing is performed by banks and non-bank entities according to different business models. For example, some lenders service the mortgage loans they originate or purchase and hold in a portfolio. Other lenders sell the

ownership interest of their mortgage loans, but retain the servicing rights. In other cases, servicers have no role in loan origination or ownership. Instead, they are hired to either service the loans in a lender's portfolio or purchase the mortgage servicing rights on securitized loans.

12. Contracts between the mortgage loan owner and servicer delineate the rights of each party. Such contracts may specify the circumstances under which a servicer may offer loan modifications to borrowers.

13. Although compensation models may vary, servicers generally recoup their investment in purchasing servicing rights and earn a profit through the following: (i) a net servicing fee, which is usually expressed as a constant rate assessed on unpaid mortgage balances; (ii) interest float on escrow accounts prior to disbursement; and (iii) marketing other products and services to borrowers.

14. Using this model, servicers are effectively compensated for functioning as payment collectors and processors. As a result, they have little incentive to provide other customer service to borrowers.

15. Furthermore, servicers are not subject to market discipline from borrowers because borrowers' ability to switch servicers is limited. On the other hand, servicers compete for business from loan owners by lowering the price of servicing, resulting in a concomitant decrease in the quality of loan servicing provided to borrowers.

16. Compounding the fraught relationship between the borrower and the servicer is the fact that servicers earn revenue from fees assessed on borrowers, such as late fees and fees for additional ministrations such as providing payoff statements and processing telephone inquiries and payments. Servicers therefore have an incentive to search for opportunities to impose fees to the borrowers' detriment.

17. The inherent characteristics of the mortgage servicing market accordingly created problems for many borrowers—problems that increased dramatically during the global financial crisis of 2007 and 2008.

18. When the financial crisis hit, mortgage loan servicers were unable to handle the surge in delinquent loans, mortgage modification requests, and foreclosures they were required to process. Delinquency rates nearly doubled from 2007 to 2009 and servicers had inadequate procedures and infrastructure to handle the upturn.

19. Servicers' inability to handle the increase in delinquent mortgage loans resulted in a variety of different harms to borrowers. Borrowers were unable to obtain information about, and servicers were unable to process, applications for loss mitigation programs to avoid foreclosure. Foreclosure proceedings were commenced without proper documentation and without adequate resources to administer the foreclosure process. Servicers also failed to sufficiently oversee third-parties handling foreclosure related services.

20. These and other consumer harms prompted State and Federal regulators to initiate a number of different regulatory and enforcement actions. Perhaps the most well-known was the National Mortgage Settlement (NMS), in which the Federal government joined with 49 State attorneys general to enter into a settlement with the nation's five largest servicers in February 2012. As part of the settlement, the nation's largest servicers were required to comply with certain standards, including standards for offering borrowers loss mitigation options to avoid foreclosure.

21. The Federal government also implemented plans, such as the Making Home Affordable Program, to help stabilize the housing market and help borrowers avoid foreclosure. The Making Home Affordable Program included sub-programs such as the Home Affordable Modification Program (HAMP) and HAMP Tier 2, which provided eligible borrowers with an opportunity to modify their mortgage loans to make them more affordable. Servicers were eligible for incentive payments for participating in HAMP.

22. These different enforcement and regulatory actions—were intended to incentivize—and in some cases force—servicers to provide borrowers with alternative payment options for their mortgage loans to avoid foreclosure. Despite these actions, however, regulators were still of the view that servicers were not devoting sufficient resources to this effort. Accordingly, they believed it was necessary to develop national mortgage servicing standards.

## The New RESPA Regulations

23. Congress originally enacted the Real Estate Settlement Procedures Act of 1974 (RESPA) based on findings that reforms to the real estate settlement process were necessary to ensure that consumers were provided with greater information on the settlement process and to protect consumers against unwarranted settlement charges. The law was amended in 1990 to cover persons responsible for servicing federally-related mortgage loans and imposed certain obligations on such servicers.

24. The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") transferred rulemaking authority for RESPA to the United States Consumer Financial Protection Bureau (CFPB) ("the Bureau"). The Dodd-Frank Act also added a section to RESPA giving the Bureau the authority to establish prohibitions on servicers of federally-related mortgage loans for the purpose of carrying out the consumer protection goals of RESPA.

25. In January 2013, the Bureau issued several final rules to address the systemic problems in the mortgage servicing industry described above and to implement protections for borrowers with regard to mortgage servicing. These new rules amended 12 C.F.R. Part 1024, RESPA (Regulation X), and became effective on January 10, 2014.

26. Specifically, the Bureau enacted a rule requiring early intervention and communication with delinquent borrowers. "Servicers must establish or make good faith efforts to establish live contact with borrowers by the 36th day of their

delinquency and promptly inform such borrowers, where appropriate, that loss mitigation options may be available." See 12 U.S.C. § 1024.39. A "delinquency" is defined as beginning on the day on which a payment sufficient to cover principal, interest and escrow, if applicable, is due and unpaid. The new rules clearly implemented procedural protections for borrowers with regard to the process of obtaining an evaluation for loss mitigation options and restrictions on the foreclosure process while borrowers are being evaluated for a loss mitigation option. See 12 C.F.R. § 1024.41.

27. Notably, under RESPA, "[l]oss mitigation option means any alternative to foreclosure offered by the owner or assignee of a mortgage loan that is made available through the servicer to the borrower." 12 C.F.R. § 1024.31. This definition was intended to be expansive, encompassing not just loan modifications, but also forbearance plans, short sale agreements, and deed-in-lieu of foreclosure programs.

28. "Loss mitigation application means any oral or written request for a loss mitigation option that is accompanied by any information required by a servicer for evaluation for a loss mitigation option." *Id.*

29. Under RESPA, "[s]ervicer means a person responsible for servicing a federally related mortgage loan (including the person who makes or holds such loan if such person also services the loan)." *Id.*

30. "Servicing means receiving any scheduled periodic payments from a borrower pursuant to the terms of any federally related mortgage loan, including

amounts for escrow accounts . . . and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the mortgage servicing loan documents or contract." *Id.*

31. "Federally related mortgage loan" means any loan that is secured by a first or subordinate lien on residential real property and that *inter alia* is made in whole or in part by any lender that is either regulated by or whose deposits or accounts are insured by any agency of the Federal Government or is made in whole or in part by a creditor that makes or invests in residential real estate loans aggregating more than $1,000,000 per year.

32. The servicer is required to promptly review the application and determine whether it is complete. If a borrower submits a complete application for a loss mitigation option at least 45 days before a foreclosure sale, the servicer must acknowledge receipt in writing within 5 days (excluding legal public holidays, Saturdays and Sundays) and must inform the borrower whether the application is complete and what information is required to complete the application. See 12 U.S.C. § 1024.41(b)(2)(B). A "complete loss mitigation" application means an application in connection with which a servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower. See 12 U.S.C. § 1024.41(b)(1).

33. If a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale for the borrower's property, then within 30 days of receiving the borrower's loss mitigation application the servicer must: "(i) Evaluate the borrower for all loss mitigation options available to the borrower; and (ii) Provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage loan." *Id.* at § 1024.41(c)(1).

34. If a foreclosure action has already been filed and it is more than 37 days before a foreclosure sale, and the borrower submits a complete loss mitigation application a servicer cannot "move for a foreclosure judgment [including a dispositive motion like a motion for default judgment, on the pleadings or summary judgment] or order of sale or conduct a foreclosure sale until one of the following has happened:

- The servicer has denied the borrower's application for loss mitigation and
- The borrower has rejected all loss mitigation options offered to the borrower by the servicer; or
- The borrower does not perform as required under a loss mitigation agreement.

Once the servicer receives a complete loss mitigation application, the servicer must "promptly" instruct any lawyers it has retained to not proceed with filing for a foreclosure judgment or order of sale, or conducting a foreclosure sale, and if

necessary, to file a for a continuance with respect to any deadlines for filing a dispositive motion." *Id.* at §1024.41(g)(1)-(3).

35. If a borrower is approved for a loss mitigation offer, the servicer may prescribe a deadline by which the borrower must accept or reject the offer. There is a minimum length of time a servicer may give the borrower to accept or reject the servicer's offer if the loss mitigation application is submitted 90 days prior to a foreclosure. The servicer has to give the borrower at least 14 days after the servicer provides the offer to accept or reject the offer. *Id.* at §1024.41(e)(1).

36. If a borrower's loss mitigation application is denied for any trial or permanent loan modification option, then the servicer shall state in the notice sent to the borrower pursuant to 12 C.F.R. § 1024.41(c) "[t]he specific reasons for the servicer's determination for each such trial or permanent loan modification option[.]" *Id.* at §1024.41(d)(1).

37. Importantly, any determination not to offer a loan modification option constitutes a denial of the borrower for that loan modification option, notwithstanding whether the servicer offers the borrower a different loan modification option or other loss mitigation option. 12 C.F.R. § 1024, Supp. I, § 41(d) cmt. 4. In other words, the servicer must still provide notice under 12 C.F.R. § 1024.41(c) explaining the specific reasons for denying a borrower a loan modification option, even if the servicer offers the borrower a different loan modification or loss mitigation option.

38. Furthermore, with regard to the content of the notice under § 41(c), if the loan modification is denied because of a requirement of the owner or assignee of the borrower's mortgage loan, then the denial notice must identify the owner or assignee of the mortgage loan and state the requirement that is the basis of the denial. It is not sufficient to merely state that denial of a loan modification option is "based on an investor requirement." The servicer must specifically identify the relevant investor and the specific requirement that purportedly constitutes the basis for the denial. 12 C.F.R. §1024, Supp. I, § 41(d) cmt. 1.

39. Additionally, if a trial or permanent loan modification is denied because of a net present value calculation, then the denial notice under § 41(c) must include all the inputs used in the net present value calculation. *Id.* at cmt. 2.

40. Finally, if a trial or permanent loan modification is denied, then the denial notice must state that the borrower has the right to appeal the servicer's determination. 12 C.F.R. § 1024.41(d)(2). A borrower may appeal denial of a loss modification program if the borrower's complete loss mitigation application is received 90 or more days prior to a scheduled foreclosure sale.

41. The appeal must be reviewed by different personnel than those responsible for evaluating the borrower's application. Further, the servicer must provide a notice to the borrower, within 30 days of the borrower making an appeal, stating the servicer's determination of whether the servicer will offer the borrower a loss mitigation option based on the appeal. *Id.* at § 1024.41(h).

42. RESPA also prohibits the practice of "dual tracking" while the loss mitigation process is under way. That is, a servicer is precluded from initiating foreclosure proceedings while a loss mitigation application is being processed. *Id.* at §1024.41(f), (g).

43. More specifically, the new RESPA regulations broadly prohibit a servicer from instituting foreclosure proceedings until a borrower's mortgage loan is more than 120 days delinquent. *Id.* at § 1024.41(f)(1). The rule *expressly prohibits* a servicer from making the first notice or filing required for a foreclosure process until the mortgage loan is more than 120 days delinquent. The Bureau issued guidance on what it considers to be the first notice or filing in the foreclosure process. As Maryland is a judicial foreclosure state, requiring lenders to wait at least 45 days after issuing a Notice of Intent to Foreclose (NOI), the earliest date for filing an Order to docket would be 165 days from the date of delinquency.

44. Even after the mortgage loan is 120 days delinquent, a servicer may not commence foreclosure if a borrower submits a complete application for loss mitigation unless and until: 1) the servicer informs the borrower that the borrower is not eligible for any loss mitigation option (and any appeal has been exhausted), 2) a borrower rejects all loss mitigation options, or 3) a borrower fails to comply with the terms of a loss mitigation option. If the borrower submits a complete application for loss mitigation more than 37 days before a foreclosure sale, a servicer may not foreclose until one of these three conditions

has been satisfied. . However, nothing in the new requirements imposes a duty on a servicer or lender to provide any borrower with any specific loss mitigation option. See 12 U.S. C. § 1024.41(a).

45. Furthermore, if a borrower submits a loss mitigation application before the servicer has started the foreclosure process, then the servicer is prohibited from going forward with foreclosure proceedings until the servicer has sent the borrower the notice required by 12 C.F.R. § 1024.41(c)(1)(ii) and the borrower either did not appeal the notice or the borrower's appeal has been denied. *Id.* at § 1024.41(f)(2), (g).

46. Borrowers have a private right of action to enforce compliance with the Early Intervention Requirements (12 C.F.R. § 1024.39) and Loss Mitigation Procedures (12 C.F.R. § 1024.41) pursuant to Section 6(f) of RESPA (12 U.S.C. § 2605(f)). *Id.* at 1024.41(a). Borrowers may seek an amount equal to the sum of any actual damages from a servicer's failure, as well as any additional damages in a case of a pattern or practice of noncompliance in an amount not to exceed $2,000. Damages awarded on borrower class actions may not exceed the lesser of $1,000,000 or 1% of the net worth of the servicer. Borrowers also may recover reasonable attorney's fees. *See*12 U.S.C. § 2605(f)(3). (Under this provision, whoever fails to comply with any portion of 12 C.F.R. § 1024.41, shall be liable to the borrower for each such failure: (i) in the case of an individual, any actual damages to the borrower as a result of the failure *and* any additional damages in an amount not to exceed $2,000.)

**Defendant's Failure To Comply With The Requirements Of The New RESPA Regulations**

47. Defendant PNC is a leading residential mortgage loan servicer and is engaged primarily in the servicing of residential mortgage loans for others. PNC's servicing business exceeds $4 billion in mortgage loans.

48. PNC services mortgage loans in all 50 states, including Maryland, and is licensed as a residential mortgage loan servicer and debt collector in all states that require such licensing.

49. Like all mortgage loan servicers, PNC's servicing primarily involves the calculation, collection, and remittance of principal and interest payments, the administration of mortgage escrow accounts, and administration of foreclosure procedures on behalf of owners of the loans. It earns fee-based revenues based upon contractually established servicing fees that consist of an amount based on either the unpaid principal balance of the loans serviced or a per-loan fee amount. PNC also generates revenue from ancillary fees, such as late fees. In addition, PNC earns float income, which is interest income on amounts deposited in escrow accounts for property taxes and insurance.

50. PNC also purports to utilize loss mitigation tools to decrease borrower delinquencies and defaults, and increase borrower repayment performance with a goal of homeownership preservation.

51. As a servicer of federally-related mortgage loans, PNC is subject to the new RESPA regulations described above. Notwithstanding this fact, PNC has violated these regulations in the servicing of Plaintiffs' loan.

**LOSS MITIGATION EFFORTS PURSUANT TO THE JANUARY 10, 2014, CFPB RULES**

52. Plaintiff owns the residential real property located at 14209 Floral Park Drive, N Potomac, MD 20878.

53. On April 5, 2004, Plaintiff received a loan from National City Mortgage Co dba Commonwealth Mid-Atlantic Mortgage in the amount of $552,000.00. The loan was secured by a deed of trust on the Property.

54. On March 21, 2014, Plaintiff submitted to PNC a 54 page application for a loan modification. PNC failed to failed to notify the Plaintiff of its receipt of the application for a loan modification as required by 12 C.F.R. § 1024.41(b)(2)(i)(B). Specifically, if the application is received 45 days or more before any scheduled foreclosure sale (no sale had been scheduled at this point in time), the servicer is required to send the borrower a written acknowledgement that the servicer received the application.

55. PNC failed to comply with the CFPB by failing to comply with 12 C.F.R. § 1024.41(b)(2)(i)(B) which requires the servicer to notify the borrower if the application is incomplete and what additional documents are needed to complete the application. The Plaintiff had no way of knowing as to whether or

not PNC deemed her application as complete as PNC failed to acknowledge receipt of the application package[1].

56. More than 30 days had passed since the Plaintiff had submitted her application for a loan modification. PNC failed to "decision" the application but rather scheduled a sale date of the subject property for May 9, 2014[2]. By moving forward with a sale of the subject property without evaluating the Plaintiff's application for a loan modification is dual tracking, which is clearly prohibited pursuant to the CFPB.

57. Instead of reviewing the application submitted by the Plaintiff on March 21, 2014, PNC requested through its attorneys on October 15, 2014, that the Plaintiff submit another application for a loan modification. Plaintiff on October 17, 2014, via her attorney, submited to PNC's attorney another application for a loan modification.

58. PNC issued a letter to the Plaintiff dated October 29, 2014, confirming receipt of the application. In this letter PNC requested the HOA statement, the mortgage statement for the second lien and for a signature and/or date (this request remains unclear).

59. On November 3, 2014, PNC's attorney emailed the Plaintiff's attorney stating that PNC required additional information to include a copy of a separation

[1] Plaintiff also reached out to Matthew Peterson of the ALBA Law Group, the Substitute Trustees in the foreclosure action; however, Mr. Peterson failed to return any of the Plaintiffs messages.

[2] The sale was ultimately canceled once Plaintiff's attorney became involved and contacted the Substitute Trustees.

agreement or divorce decree and a quit claim deed. These items were not requested in the PNC letter dated October 29, 2014. On November 20, 2014, Plaintiff's attorney emailed PNC attorney that PNC had informed the Plaintiff specifically that no quit claim deed was required. All other documents are timely forwarded to the PNC attorney on December 10, 2014.

60. PNC has failed to date to review and decision the application submitted by the Plaintiff on October 17, 2014.

61. PNC's attorney contended that the PNC October 29, 2014, letter constituted a denial of Plaintiffs' application for a loan modification. The October 29, 2014, failed to comply with the CFPB requirements for a denial. A denial letter has to include the reason for the denial, the name of the owner/investor of the loan and provide the borrower with the opportunity to appeal the denial. The October 29, 2015 letter failed to contain the reason for the denial (it failed to even state that it is a denial letter), the name of the owner/investor of the loan and there is no language advising the Plaintiff of her right to appeal the denial.

62. PNC's attorney/the Substitute Trustees claimed that a quit claim deed was required despite the fact that PNC had never made this request to the Plaintiff in writing as required by the CFPB. PNC's attorney/the Substitute Trustees claimed that if the Plaintiff's divorce were final no quit claim deed would be required. Relying on this information, the Plaintiff submits yet another application for a loan modification in August 2015.

63. PNC via a letter dated August 18, 2015, denied the application for a loan modification claiming that the nameless investor has not provided authority to modify the loan.

64. The Plaintiff promptly appealed the denial via a letter dated August 26, 2015, claiming a violation of 12 C.F.R. § 1024.41(d) that requires:

If the applicant is denied for any available loan modification program the written notice must meet the following requirements:

- The notice must give specific reasons for denial if the borrower's application is denied for **any** loan modification program (trial or permanent).
- If the borrower is rejected because of investor or mortgage owner requirements, the servicer has to identify the specific owner, assignee, investor guarantor whose rules mandated the rejection, and **specifically identify the requirement that is the basis of the denial.**
    - It is not sufficient for the servicer to say that denial of the modification is based on "an investor requirement."

65. The CFPB requires that the appeal must be reviewed by different personnel than those responsible for evaluating the borrower's application. And, within 30 days of the borrower making an appeal, the servicer must provide a notice to the borrower stating the servicer's determination of whether the servicer will offer the borrower a loss mitigation option based on the appeal. *Id.* at § 1024.41(h). To date, PNC has failed to respond to the Plaintiff's appeal to the denial of the application for a loan modification.

66. Despite failing to respond to Plaintiff's appeal letter, PNC dual tracked the Plaintiff by scheduling a foreclosure sale of her home on November 20, 2015 in

violation of the CFPB. Pursuant to 12 C.F.R. §1024.41(g)(1), if a foreclosure action has already been filed and it more than 37 days before a foreclosure sale, and the borrower submits a complete loss mitigation application (as in this instant case), a servicer cannot "move for a foreclosure judgment [including a dispositive motion like a motion for default judgment, on the pleadings or summary judgment] or order of sale or conduct a foreclosure sale **until one of the following has happened:**

a. **The servicer has denied the borrower's application for loss mitigation** and

b. The borrower has rejected all loss mitigation options offered to the borrower by the servicer; or

c. The borrower does not perform as required under a loss mitigation agreement.

67. As a result of Defendant's failure to comply with RESPA to timely review the application for a loan modification, Plaintiff has been assessed additional fees and costs including an interest per day assessment.

68. As 12 C.F.R. § 1024.41 (c)(1)(i) requires that a borrower be reviewed for all loss mitigation options that the borrower may be eligible pursuant to any requirements established by the owner of the borrower's mortgage, disclosure of the owner of the subject mortgage is compulsory.

**COUNT ONE**

**(Violation Of 12 C.F.R. § 1024.41)**

69. Plaintiff realleges and incorporates each and every allegation set forth above as if fully written herein.

70. PNC is a mortgage loan servicer within the meaning of 12 C.F.R. §1024.31.

71. Plaintiff is a borrower of federally-related mortgage loan within the meaning of 12 C.F.R. § 1024.31.

72. Plaintiff submitted a loss mitigation application within the meaning of 12 C.F.R. § 1024.31.41.

73. By virtue of the acts described above, PNC engaged in a pattern and practice of violating and failing to comply with the requirements of 12 C.F.R. § 1024.41 with respect to Plaintiff.

74. PNC violated 12 C.F.R. § 1024.41 by failing to notify Plaintiff within 5 days after receiving a loss mitigation application that PNC acknowledges receipt of the loss mitigation application and that it has determined that the application is either complete or incomplete.

75. PNC violated 12 C.F.R. § 1024.41(b)(2)(i)(B) by failing to notify Plaintiff if the application is incomplete and what additional documents are needed to complete the application.

76. PNC violated 12 C.F.R. §1024.41(g)(1) by scheduling a sale of the Plaintiff's property on May 9, 2014 and November 20, 2015, when PNC had not yet properly denied the Plaintiff for a loan modification.

77. PNC violated 12 C.F.R.§ 1024.41 by failing to provide Plaintiff the name of owner/investor of the subject loan in the denial letter.

78. PNC violated 12 C.F.R.§ 1024.41 by failing to provide Plaintiff an opportunity to appeal the denial of the loan modification.

79. PNC violated 12 C.F.R.§ 1024.41(h). by failing to respond to the Plaintiff's appeal to the denial of the application for a loan modification.

80. As a result of PNC's acts to disregard the Codes of Federal Regulations hereinabove cited, which Plaintiff reasonably perceives demonstrate acts to intimidate and harass her, Plaintiff suffers damages in excess of Seventy-Five Thousand dollars, and is entitled interest cost, attorney fees, and such other and further relief as justice may require.

## COUNT II

**(Violation Of 12 U.S.C. § 5564(a)-(b); 15 U.S.C. § 16921(b)(6); and 12 U.S.C. § 5481(12)(H), (14) the Consumer Financial Protection Act ("CFPA"))**

81. Plaintiff realleges and incorporates each and every allegation set forth above as if fully written herein.

82. By virtue of Defendant's actions in violating the CFPB provisions herein above identified, Defendant violates the 'Final Rules' promulgated by the CFPB and implemented January 10, 2014.

83. The CFPA is a federal consumer financial law. 12 U.S.C. § 5481(14) prohibiting covered persons or service providers from engaging "in any unfair, deceptive, or abusive act or practice." 12 U.S.C. §§ 5531, 5536(a)(1)(B). Section 1054(a) of the CFPA grants the CFPB authority to commence a civil action against any person who violates a federal consumer financial law. 12 U.S.C. § 5554(a).

84. The CFPA defines a "service provider" as "any person that provides a material service to a covered person in connection with the offering or provision by such

covered person of a consumer financial product or service." 12 U.S.C. § 5481(26).

85. Defendant's unfair and deceptive practices violating the CFPA caused actual injury to Plaintiff.

86. As a result, Plaintiff suffers damages in excess of Seventy-Five Thousand dollars and is entitled interest cost, attorney fees, and such other and further relief as justice may require.

**COUNT III**

**(Violation Of The Maryland Consumer Protection Act, Md. Comm. Law §§ 13-101 *et seq.*)**

87. Plaintiff realleges and incorporates each and every allegation set forth above as if fully written herein.

88. The Maryland Consumer Protection Act (MCPA) defines a "consumer" as a "recipient of consumer goods, consumer services, consumer realty, or consumer credit." Md. Comm. Law § 13-101(c)(1).

89. The MCPA defines "consumer services" as "services which are primarily for personal, household, family, or agricultural purposes." *Id.* at § 13-101(d)(1).

90. The MCPA defines a "servicer" as a "person responsible for collection and payment of principal, interest, escrow, and other moneys under an original mortgage." *Id.* at § 13-316(a)(3).

91. Plaintiff is a "consumer" within the meaning of the MCPA.

92. PNC is a "servicer" within the meaning of the MCPA.

93. PNC offers to provide "consumer services" within the meaning of the MCPA. Such consumer services include offering loss mitigation plans to borrowers.

94. PNC represented to Plaintiff that it offers a variety of loss mitigation plans, including those that would allow borrowers to retain ownership of their homes, such as loan modifications and forbearance agreements, but also ones that would allow borrowers to transfer ownership of their homes under more favorable terms than those allowed for by the loan agreement, such as short-sale agreements and deed-in-lieu of foreclosure programs.

95. PNC offered these consumer services without the intent to provide them as offered in violation of the MCPA. *See id.* at § 13-301(5)(i).

96. PNC offered these consumer servicers with the intent not to supply reasonably-expected public demand in violation of the MCPA. *See id.* at § 13-301(5)(ii).

97. Plaintiff relied upon PNC's unfair and deceptive practices that violated the MCPA.

98. PNC's unfair and deceptive practices that violated the MCPA caused actual injury to Plaintiff.

99. As a result, Plaintiff suffers damages in excess of Seventy-Five Thousand dollars and is entitled interest cost, attorney fees, and such other and further relief as justice may require.

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Award damages, including compensatory and exemplary damages, to Plaintiff in an amount to be determined at trial;

b. Award statutory damages and/or penalties to Plaintiff;

c. Permanently enjoin PNC from engaging in the wrongful and unlawful conduct alleged herein;

e. Award Plaintiff the expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

f. Award such further relief as the Court deems appropriate.

Gerard P. Uehlinger
28 W. Allegheny Avenue
Suite 1210
Towson MD 21204
410-821-0025
Attorney for Plaintiff

**ELECTION OF JURY TRIAL**

Teresa Darby, Plaintiff, elects that this matter be tried before a jury.

Gerard P. Uehlinger